NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:  
: Chapter 11  
LEOMINSTER MATERIALS CORPORATION : Case No. 05-42488  
:  
Debtor :

## MEMORANDUM OF DECISION DENYING CONFIRMATION OF PLAN OF REORGANIZATION

This matter came before the Court for an evidentiary hearing on the confirmation of the Debtor's plan of reorganization, dated July 15, 2005 [docket # 45] and the objection of the secured creditor, First Fidelity Corp. [docket # 60]. For the reasons set forth herein, confirmation is DENIED.

BACKGROUND

In March 2003 the Debtor borrowed $1.5 million from First Fidelity and in exchange granted First Fidelity a first mortgage on the Debtor's 64 acre parcel of land, located in Leominster, Massachusetts (the "Real Estate") at the intersection of Route 190 and Route 117, and a security interest in all of the Debtor's personalty. The Debtor subsequently defaulted and First Fidelity advised the Debtor of its intent to foreclose. Before the foreclosure sale was to take place, the Debtor filed its Chapter 11 petition. As of the petition date, the Debtor owed First Fidelity in excess of $1.6 million and currently owes over $1.9 million.

The proposed plan of reorganization calls for the Debtor to pay First Fidelity's claim, plus interest at the non-default contract rate of 12%, within 36 months of the

effective date of the plan. First Fidelity is to retain its security interest in the Real Estate.[1] The Debtor proposes that the unsecured creditors, whose claims aggregate to approximately $950,000, will receive a second mortgage on the Real Estate and will also be paid in full, albeit without interest, within 36 month of the effective date of the plan. The equity holders will retain their interests in the Debtor. There will be no payments to First Fidelity, who has not received a mortgage payment since 2004, until the Real Estate is sold unless there are surplus proceeds from the potential mining operations at the site.

In order to pay the creditors, the Debtor proposes to sell the Real Estate within 36 months and use the proceeds to pay both First Fidelity and the unsecured creditors. If the Debtor has not sold the Real Estate within 180 days of the effective date of the plan or such earlier time as the Debtor may elect, a broker will be engaged to market and sell the Real Estate. Although the plan requires the Debtor to share all offers to purchase with First Fidelity, it, however, does not impose any affirmative obligation on the Debtor to sell. The plan does not set forth any minimum or maximum price thresholds. If at the end of the 36 month period, the Real Estate has not been sold, the plan calls for the Real Estate to be turned over to First Fidelity free and clear of all liens, claims, and encumbrances. The Real Estate would belong to First Fidelity with no obligation to pay unsecured creditors in the event the proceeds of any sale conducted by First Fidelity exceed the amount then owed to it.

During the period from the effective date of the plan to the longer of (i) the date

---

[1] At the confirmation hearing, counsel for the Debtor acknowledged that any confirmation order should also provide that First Fidelity retain its lien on the personalty.

2

on which the Debtor sells the Real Estate and (ii) 36 months, the Debtor will not make any payments to First Fidelity. It anticipates that it will pay the usual carrying expenses of the Real Estate from money derived from crushed stone operations at the Real Estate and cash infusion from a sister company if the sister company becomes profitable. In 2000 through 2002 the Debtor realized profits from the operation of this business in excess of $100,000 per year when the sand and gravel was removed without the need for drilling but in 2003 and 2004 revenue sharply declined to $14,443 and $7,500, respectively because substantial drilling and mining operations were needed to access the stone.

First Fidelity has voted to reject the plan and filed an objection to confirmation. The unsecured creditors have unanimously voted to accept the plan.

The Debtor's principal asset is the Real Estate which it acquired in 1994 from P.J. Keating Corporation. Paul J. Keating II, the Debtor's president and the trustee of the trust which owns 100% of the shares of the Debtor had been the president and CEO of P.J. Keating Corporation. Mr. Keating was the only witness testifying at the confirmation hearing. He testified that in his opinion the Real Estate was worth $15 million although the cover sheet of the Chapter 11 petition lists the assets as having an aggregate value in the range of $1-10 million while Schedule A lists the value of the Real Estate as "undetermined." He testified that the real estate has two uses, one as a stone quarry that would yield approximately 22 million tons of stone at a net price of $1.25 per ton on a royalty basis, the other for potential commercial development. The Debtor's predecessor had received offers to purchase or expressions of interest since 1989 but it was only with a 2001 zoning change that interest increased according to Mr.

3

Keating. The Debtor has been actively attempting to sell the Real Estate since late 2003.

Unlike the income realized in the past from the removal of sand and gravel, mining the stone now would require the substantial drilling and blasting on the Real Estate. The Debtor does not have any contract with any company to do this work. In fact Mr. Keating testified most companies performing this kind of work look for a three to five year contract because of the high cost to the mining company to move in the equipment needed to mine the stone. Moreover although Mr. Keating testified that the sister company has started to become profitable, there is no agreement or demonstrated ability to fund the Debtor's post confirmation operations. He also testified that, based upon his attempts to secure financing for this property, it was his opinion that 12% would be the interest rate the Debtor would need to pay. That rate, however, is based upon the assumption that mortgage payments would be made at regular intervals rather than accruing as provided for in the plan.

DISCUSSION

At confirmation the plan proponent bears the burden of demonstrating by a preponderance of the evidence that each element of 11 U.S.C. § 1129 has been met. *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership*, 248 B.R. 668, 690 (D. Mass. 2000). Among those elements is the requirement that each impaired class or interest vote to accept the plan. 11 U.S.C. § 1129(a)(8). Where, as here, one class of creditors has voted to reject the plan, the plan may be confirmed only if it meets the so-called cramdown test for non-consensual plans set forth in 11 U.S.C. § 1129(b). To satisfy the cramdown test, the plan first, "must comply with all other general requirements of §

1129(a) and be accepted by at least one impaired class. See id. § 1129(a)(10). Second, the objection of an impaired creditor class may be overridden if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.' Id. § 1129(b)(1)." *Id.* at 678.

Among the requirements that the Debtor must satisfy under § 1129(a) is proof that the plan is feasible. In the context of confirmation of a chapter 13 plan, feasibility has been defined as "a reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary resources to make all payments as directed by the plan." *In re Fantasia*, 211 B.R. 420, 423 (1st Cir. BAP 1997). Courts have found the feasibility requirement of § 1129(a)(11) to be more stringent that the feasibility standard imposed under Chapter 13 "because confirmation of a chapter 11 plan generally acts as a discharge at the time of confirmation, rather than only after the promised payments have been made. (Compare 11 U.S.C. § 1129(a)(1) and § 1141(d)(1) with 11 U.S.C. § 1325(a)(6) and § 1328(a)). In the chapter 11 context, that concern means the scrutiny of feasibility should increase as the effect of the discharge on creditors increases." " *In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 790 (Bankr. S.D. Ohio 1985). Nevertheless the test "does not require proof that meeting the economic projections is certain....The requirement is to prevent confirmation of visionary schemes. The Court must find that the financial projections presented to support a plan of reorganization are derived from realistic and reasonable assumptions which are capable of being met." *Id.* at 789

Based upon the evidence submitted, the Debtor cannot satisfy the feasibility test.

First the Debtor bases its ability to pay the expenses for maintaining the Real Estate based on money it receives from mining operations and from a sister company in the event that mining revenue is nonexistent or insufficient. The Debtor has not provided any credible evidence that either source of funds will be available. That the Debtor will be able to find a mining company willing to expend the resources necessary to access the stone when the Real Estate must either be sold or turned over to First Fidelity within 36 months is speculative at best. The Debtor's expectation that its affiliate will become sufficiently profitable to fund expenses if and to the extent needed is not supported by any hard evidence. There was no evidence of the current financial status of the affiliate and no basis upon which to characterize its anticipated profitability as anything other than a hope. All the Debtor has is Real Estate that, to date, has not been the subject of a successful purchase and sale agreement and whose value is uncertain at best. Moreover, even if the Debtor were to enter into a mining contract, there is no evidence of what the change to the topography of the Real Estate due to the mining operations would do to the value of the Real Estate while, given the absence of interim payments, the amount of First Fidelity's claim must certainly increase.

Given that the plan is not feasible, the Court need not consider whether the plan satisfies the other requirements for cramdown other than to say it has serious doubts as to whether an interest rate which the Debtor's principal acknowledged was based on a rate he believed a lender would charge a borrow under a loan that called for mortgage payments to be made at regular intervals is the appropriate rate.

Finally, although the unsecured creditors voted unanimously to accept the plan, the Court cannot help but comment on their treatment under the plan. Unless the Real

estate is sold within 36 months, they take nothing. Their rights will be eliminated upon the transfer of the Real Estate free and clear to First Fidelity so that any proceeds of a subsequent sale of the property, even for a price in excess of First Fidelity is then owed, will not go to them. The First Amended Disclosure Statement and the plan only mention the elimination of the unsecured creditors' rights in their discussion of the treatment of First Fidelity's claim; the discussion of the treatment of unsecured claims only addresses the formation of a distribution trust and the second mortgage that will secure payment of all unsecured claims. Any new disclosure statement and plan will need to explicitly advise the unsecured creditors if their rights are subject to termination.

CONCLUSION

    For the foregoing reasons, confirmation is DENIED.

    A separate order will issue.

Dated: November 17, 2005

Joel B. Rosenthal
United States Bankruptcy Judge