NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re:

LEOMINSTER MATERIALS CORPORATION

Debtor

Chapter 11
Case No. 05-42488

## MEMORANDUM OF DECISION ON CONFIRMATION OF SECOND AMENDED PLAN OF REORGANIZATION

This matter came before the Court for an evidentiary hearing on the confirmation of the Debtor's second amended plan of reorganization, dated February 9, 2006 [docket # 91] and the objection of the secured creditor, First Fidelity Corp. [docket # 102]. For the reasons set forth herein, the Court will enter an order CONFIRMING the second amended plan of reorganization.

FACTS

The Court conducted an evidentiary hearing at which the Debtor's principal, an attorney who represented the Debtor in connection with zoning matters, and the principal of a quarrying company whom is proposing to mine the Debtor's land testified. The secured creditor who opposes confirmation offered no witnesses. Based upon the evidence and a review of the relevant pleadings, the Court makes the following findings of fact and conclusions of law.

The Debtor owes approximately $2 million to First Fidelity which holds a first mortgage on the Debtor's 64 acre parcel of land, located in Leominster, Massachusetts (the "Real Estate") at the intersection of Route 190 and Route 117, and a security

interest in all of the Debtor's personalty. First Fidelity estimates that, interest and charges of approximately $300,000 accrue annually.

The Debtor filed a previous plan of reorganization, dated July 15, 2005, which the Court determined, was not feasible. See Memorandum of Decision Denying Confirmation of Plan of Reorganization [#69]. Since that time the Debtor has entered into a contract, effective if the plan is confirmed, with Onyx Transportation, Inc., which among other things, conducts sand and gravel operations, excavations and road building. Onyx's place of business is located next to the Real Estate on Jungle Road in Leominster. Onyx is responsible for obtaining any needed permits. Onyx has previously conducted stone removal from the Real Estate and under the contract Onyx will mine stone and gravel from the Real Estate. It already has equipment on the site. The mining contract is for a three year period but the Debtor may terminate the contract earlier by paying a termination fee. The contract calls for Onyx to pay $1 per ton for the stone it mines with a guaranteed minimum fee of $75,000 per year. There is nothing in the contract to suggest this fee is not due even if Onyx does not mine the Real Estate. Onyx will pay the real estate taxes; the Debtor will not incur any operating expenses in connection with the Real Estate.

The second amended plan of reorganization calls for the Debtor to pay First Fidelity's claim, plus interest at the rate of 18%, within 24 months of the effective date of the plan from funds generated from the sale of the Real Estate. The time within which the Debtor is to pay First Fidelity can be extended to 36 months at the Debtor's election, provided that the Debtor pays all interest accrued during the 2 years after the effective date and continues to make monthly interest payments during the 1 year

2

extension period. First Fidelity is to retain its security interest in the Real Estate. The Debtor proposes that the unsecured creditors, whose claims aggregate to approximately $950,000, will receive a second mortgage on the Real Estate and will also be paid in full, albeit without interest, upon the sale of the Real Estate. The equity holders will retain their interests in the Debtor.

First Fidelity has voted to reject the plan and filed an objection to confirmation. The unsecured creditors have unanimously voted to accept the plan.

First Fidelity objects to the second amended plan primarily because it claims that the Real Estate's value is less than its claim, that the mining operations will diminish the value of the Real Estate, and that the 18% interest rate is insufficient. At the hearing First Fidelity claimed that Leominister's zoning ordinances prohibit mining operations at the Real Estate which is zoned for industrial use.

Paul J. Keating II, the Debtor's president, testified at the most recent confirmation hearing that in his opinion the Real Estate was currently worth $15 million. He also testified that the mining operations will improve the Real Estate. It will level the property and bring it down to approximately 40 feet above the grade of Jungle Road thus making it more attractive for future development.

Although First Fidelity argues that the Debtor cannot conduct mining operations on the Real Estate because of Leominister's zoning ordinances, the evidence is otherwise. Both Mr. Keating and Attorney John Curley, who previous was the city solicitor for the City of Leominister for approximately 8 years, and who has represented the Debtor in connection with its dispute with the City over prior iterations of the zoning ordinances, testified that the Debtor did not need any additional permits to mine the

3

land.[1] The 2001 changes to the City's zoning ordinance allows the removal and quarrying of stone in an industrial zone. Moreover, John Durkin, Onyx's principal, testified that he was not aware of any special permits, beyond blasting permits, that would be required for Onyx's stone removal operations, which he confirmed would help level the land.

First Fidelity did not offer any witnesses to testify otherwise. Instead it relied upon the 1997 decision of the Massachusetts Appeals Court in *Leominster Materials Corporation v. Board of Appeals of Leominster*, 42 Mass. App. Ct. 458, 677 N.E.2d 714 (1997). In that case the appeals court upheld the upheld the zoning board's refusal to overturn the director of inspection's interpretation of the zoning ordinances. The appeals court concluded that an ordinance expressly permitting the removal of "sand, gravel, or loam" did not permit the removal of other earth products and that an ordinance prohibiting mining in water supply districts did not imply that mining outside water supply districts was permitted. In a footnote the court noted that the director concluded that the quarrying operations were not incidental to excavation and grading needed in order for construction to occur on the Real Estate. Rather "the director concluded that LMC's stone removal was a 'primary manufacturing operation' and therefore a prohibited use." *Id.* at 462, n.4, 677 N.E.2d at 717, n. 4. Following the appeals court decision, Leominster's zoning ordinances were amended and the relevant ordinance now read as follows:

Section 22-24    Industrial Districts

---

[1] The Debtor's witnesses acknowledge that Onyx may need blasting permits but First Fidelity has not challenged Onyx's ability to obtain blasting permits.

4

> Except as provided in Section 2-16, in all portions of the City designated on the Zoning Map as the Industrial District, no land or buildings shall be used for any use not set forth in Section 22-26 Table of Uses as one allowed in the district by right or as one allowed in the district subject to a special permit requirement. In addition, in the Industrial district:
>
> In all portions of the City indicated on the Zoning Map as Industrial Districts:
>
> 24.1  All permitted uses shall be subject to the appropriate provisions of Section 22-16 and Article III.
>
> 24.2.  The following uses of land, buildings and structures are permitted with the following conditions:
>
> \*\*\*
>
> 24.2.6 Manufacturing uses shall be permitted, except that the following uses are specifically <u>prohibited</u>:
>
> \*\*\*
>
> 24.2.6.2 Cement, gypsum, lime or plaster of paris manufacture....

Mr. Keating testified that the quarrying was not the same as the manufacture of cement, gypsum, lime or plaster of paris. Both he and Attorney Curley, who is well versed in the City's zoning ordinances, testified that quarrying could occur without special permitting because Leominster's director of inspections previously determined that quarrying of the type that was the subject of the Debtor's unsuccessful appeal is "manufacturing" and it is a manufacturing use not included within the prohibited manufacturing uses. First Fidelty challenges that quarrying is classified as manufacturing but offered no witnesses to support that interpretation. Its argument is simply that the appeals court footnote quoting the director's finding that the Debtor's mining of the Real Estate was a "primary manufacturing use" should not be read to

mean that mining falls under the zoning ordinances regarding manufacturing. First Fidelity is correct that one of the director's findings was that quarrying was done for the primary purpose of obtaining stone, not to level the property. But it would have the Court focus on the word "primary" to the exclusion of the word "manufacturing." The Court disagrees that the director's statements did not mean quarrying is manufacturing. Therefore the Court finds that the mining of the Real Estate is a permitted use. Yet even if the Court is incorrect and quarrying cannot be carried out at the Real Estate, then the value of the property will not significantly change from its current value of approximately $15 million. First Fidelity cannot have it both ways: either (1) the Real Estate, which will remain unchanged if quarrying cannot be carried at the site, will continue to have a value greatly in expert of First Fidelity's claim or (2) the Real Estate will be mined and the net profits paid to First Fidelity until the property can be sold or turned over to First Fidelity, if the property cannot be sold within 24 or 36 months, whichever period is applicable. Under either scenario, Onyx is obligated to pay the real estate taxes and $75,000 per year.

DISCUSSION

At confirmation the plan proponent bears the burden of demonstrating by a preponderance of the evidence that each element of 11 U.S.C. § 1129 has been met. *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership*, 248 B.R. 668, 690 (D. Mass. 2000). Among those elements is the requirement that each impaired class or interest vote to accept the plan. 11 U.S.C. § 1129(a)(8). Where, as here, one class of creditors has voted to reject the plan, the plan may be confirmed only if it meets the so-called cramdown test for non-consensual plans set forth in 11 U.S.C. § 1129(b). To satisfy

6

the cramdown test, the plan first, "must comply with all other general requirements of § 1129(a) and be accepted by at least one impaired class. 11U.S.C. § 1129(a)(10). Second, the objection of an impaired creditor class may be overridden if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.' Id. § 1129(b)(1)." *Id.* at 678.

Among the requirements that the Debtor must satisfy under § 1129(a) is proof that the plan is feasible, a requirement that First Fidelity argues is not satisfied. In the context of confirmation of a chapter 13 plan, feasibility has been defined as "a reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary resources to make all payments as directed by the plan." *In re Fantasia*, 211 B.R. 420, 423 (1st Cir. BAP 1997). Courts have found the feasibility requirement of § 1129(a)(11) to be more stringent that the feasibility standard imposed under Chapter 13 "because confirmation of a chapter 11 plan generally acts as a discharge at the time of confirmation, rather than only after the promised payments have been made. (Compare 11 U.S.C. § 1129(a)(1) and § 1141(d)(1) with 11 U.S.C. § 1325(a)(6) and § 1328(a)). In the chapter 11 context, that concern means the scrutiny of feasibility should increase as the effect of the discharge on creditors increases." *In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 790 (Bankr. S.D. Ohio 1985). Nevertheless the test "does not require proof that meeting the economic projections is certain....The requirement is to prevent confirmation of visionary schemes. The Court must find that the financial projections presented to support a plan of reorganization are derived from realistic and reasonable assumptions which are capable of being met." *Id.* at 789.

7

Indeed under the preponderance of the evidence standard, the threshold of proof is not great.

Based upon the evidence submitted, the plan satisfies the feasibility test. Even if Onyx is unable to carry out quarrying operations at the Real Estate, the contract still calls for a minimum payment of $75,000 per year and for Onyx to pay the real estate taxes. Yet the Court finds, based upon its own reading of the zoning ordinances, that it is more likely than not that quarrying and removal of stone can be carried out at the Real Estate without any further permits, except for the blasting permits which First Fidelity did not even allege would be a problem to get. There is evidence that the change to the topography of the Real Estate due to the mining operations will enhance the value of the Real Estate and, as noted, even if the Court is incorrect, the property is worth considerably more than First Fidelity's claim, even if the claim grows to $3 million.

First Fidelity further argues that the 18% interest rate is insufficient to give it indubitable equivalent. It seeks an additional 2%. It has not offered any testimony to rebut the testimony that 18% is sufficient given the amount by which First Fidelity is oversecured. Although first Fidelity may not receive any payments for as long as 24 months, the risk that it will not be paid in full, including interest, is minimal and indeed, virtually non-existent.

The plan satisfies the requirements for confirmation under § 1129(a) and the cramdown requirements under § 1129(b).

Case 05-42488    Doc 114    Filed 04/24/06    Entered 04/24/06 15:53:11    Desc Main
                    Document      Page 9 of 9

CONCLUSION

For the foregoing reasons, the second amended plan will be CONFIRMED.

A separate order will issue.

Dated: April 24, 2006

Joel B. Rosenthal
United States Bankruptcy Judge